**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| DARRION B., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:17-CV-2866-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

By consent of the parties and the order of transfer dated February 5, 2018 (doc. 13), this case

has been transferred for the conduct of all further proceedings and the entry of judgment. Based on

the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and

the case is **REMANDED** for further administrative proceedings.

## I. BACKGROUND

Darrion B. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social

Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of

the Social Security Act (Act). (*See* docs. 1; 15.)

### A.    Procedural History

On March 16, 2015, Plaintiff filed his application for DIB, alleging disability beginning on

February 14, 2015. (doc. 11-1 at 78.)[1]  His claim was denied initially on April 27, 2015, and upon

reconsideration on July 2, 2015. (*Id.* at 87, 95.)  On July 30, 2015, Plaintiff requested a hearing

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

before an Administrative Law Judge (ALJ). (*Id*. at 98.) He appeared and testified at a hearing on July 20, 2016. (*Id*. at 42-71.) On October 6, 2016, the ALJ issued a decision finding him not disabled and denying his claim for benefits. (*Id*. at 28-37.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council. (*Id*. at 175.)[2] The Appeals Council denied his request for review on August 30, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.** **Factual History**

**1.** **Age, Education, and Work Experience**

Plaintiff was born on July 7, 1965, and was 51 years old at the time of the hearing. (doc. 11-1 at 36, 48.) He had at least a high school education and could communicate in English. (*Id*. at 36.) He had past relevant work experience as a "porter." (*Id*. at 35.)

**2.** **Medical Evidence**

Plaintiff received treatment at Baylor University Medical Center (Baylor) from February 15, 2015, until February 25, 2015. (*Id*. at 266-70, 73, 80.) He initially presented to Baylor following a motor vehicle accident that occurred after he fell asleep at the wheel, and he reported that he was often sleepy when driving. (*Id*. at 266, 268, 273.) A CT scan revealed an acute type II C1 Jefferson fracture and a transverse ligament avulsion. (*Id*. at 268, 280.) His hospitalization was complicated by aspiration pneumonia, and he was on a ventilator. (*Id*. at 268.) It was noted that he had hypertension and diabetes and had also been treated for acute gout. (*Id*.) He underwent an open reduction with internal fixation (ORIF) of the C1 fracture on February 18, 2015, with Matthew

---

[2] Plaintiff "Request for Review of Hearing Decision/Order" is undated. (*See* doc. 11-1 at 175.)

Berchuck, M.D. (*Id*. at 266, 268.) His post-operative diagnosis was a displaced Jefferson fracture with transverse ligament avulsion. (*Id*.)

Plaintiff had a pulmonary and sleep medicine consultation at Baylor on February 24, 2015. (*Id*. at 268.) He reported going to bed at 8 p.m. and usually waking up between 5-5:30 a.m. (*Id*.) He had "nocturia" 3-4 times per night, and when he would wake up, he would be sleepy and remain sleepy throughout the day. (*Id*.) He was diagnosed with obstructive sleep apnea (OSA) and was prescribed a continuous positive airway pressure (CPAP) machine. (*Id*. at 269-70.) He was discharged on February 25, 2015, with a diagnosis of a closed C1 fracture, and provided with a "Miami J collar." (*Id*. at 288-89, 305, 329.) He was ordered to follow-up with Dr. Berchuck two weeks after his discharge. (*Id*. at 333.)

On March 12, 2015, Plaintiff saw Dr. Berchuck for a post-operation follow-up, and no current problems were noted. (*Id*. at 390.) He was out of his Miami J collar, and his incision was nicely healed. (*Id*.) X-rays showed his fixation to be intact, and there was no evidence of a C1-2 subluxation. (*Id*.) He was instructed to continue wearing his Miami J collar and to follow up with Dr. Berchuck in three weeks for a repeat checkup. (*Id*.)[3]

On March 17, 2015, Plaintiff saw David L. Luterman, M.D., for his OSA. (*Id*. at 359.) His blood pressure was 122/70, and his body mass index (BMI) was 37.84. (*Id*.) He had symmetrical strength and a normal gait, and he was alert and oriented. (*Id*. at 360.) Dr. Luterman assessed OSA, diabetes mellitus without mention of complication, and unspecified gout. (*Id*.)

On August 18, 2015, Plaintiff presented to Parkland Hospital (Parkland) for a physical

---

[3] Although it appears that Plaintiff had another follow-up appointment with Dr. Berchuck on April 2, 2015, the report is listed as an "on hold document." (doc. 11-1 at 388.) It does not appear that an examination was conducted, and no current problems, impressions, or recommendations were noted. (*Id*. at 388-89.)

examination.  (*Id*. at 404.)  The review of symptoms was negative, physical examination was essentially normal, and he was alert and oriented times 3.  (*Id*.)

On October 21, 2015, Plaintiff returned to Parkland and underwent a cervical spine myelogram.  (*Id*. at 455, 472-75.)  He was grossly intact neurologically, and he had minimally decreased left grip strength relative to the right, normal gait, and mildly limited neck flexion and extension.  (*Id*. at 464.)  The results revealed degenerative disc disease without a significant degree of central canal narrowing and mild right neural foraminal narrowing at C5-6.  (*Id*. at 457.)  He was diagnosed with cervical myelopathy.  (*Id*. at 456.)

On November 19, 2015, Plaintiff saw Jason Allen Hunt, M.D., at Parkland's traumatic brain injury clinic for bilateral headaches, neck stiffness, and forgetfulness.  (*Id*. at 446.)  He reported that he slept well at night but felt depressed and anxious.  (*Id*.)  He had occasional pain in his knees and left shoulder, was able to walk through Walmart "just fine", and he sometimes used a cane.  (*Id*.)  He had no focal weakness but felt weaker since his accident, and although he used to work as a housekeeper, he had not worked since the accident because he "just [could not] do it."  (*Id*.)  He was diagnosed with a history of a traumatic brain injury, neck pain, and bilateral shoulder pain.  (*Id*. at 445.)  His physical examination was normal, and mentally he could spell "world" forward but not backwards, repeat "[n]o ifs, ands, or buts", perform only one serial 7, recall 3/3 items immediately, and recall 1/3 items after 5 minutes.  (*Id*. at 449.)  Dr. Hunt found that Plaintiff had cognitive and memory deficits and thought that he would benefit from speech therapy as well as PATE neurological rehabilitation due to his high level of cognitive therapy needs.  (*Id*. at 449-50.)  Dr. Hunt referred Plaintiff to PATE rehabilitation and also ordered that he undergo an MRI.  (*Id*. at 450.)

On December 21, 2015, Plaintiff underwent an MRI at Parkland.  (*Id*. at 440.)  The results

revealed moderate chronic microvascular ischemic changes. (*Id*.)

On December 18, 2015, Plaintiff was admitted to PATE rehabilitation, and he was discharged on February 1, 2016. (*Id*. at 479.) He was originally scheduled to be discharged on April 21, 2016, but his attendance was sporadic, and he decided that he was unable to participate in daily rehabilitation. (*Id*. at 479, 482) He felt that he could only attend therapy 1-2 times per week, and since the rehabilitation program was an intensive 5 day per week program, he was discharged early with recommendations for outpatient physical therapy, occupational therapy, and speech and language therapy. (*Id*.)

On February 4, 2016, Plaintiff went to Parkland with complaints about his traumatic brain injury. (*Id*. at 535.) He reported that he was admitted to PATE and attended 9 rehabilitation sessions before he withdrew from treatment. (*Id*.) He withdrew because he was too tired and having pain, and his headaches had not changed much. (*Id*.)

On February 18, 2016, Plaintiff returned to Parkland for an evaluation due to his prior traumatic brain injury. (*Id*. at 528.) He complained of headaches every several days, neck stiffness, and poor memory. (*Id*.) He used Advil and had tried Tramadol for his headaches, but neither helped, and he had some photosensitivity. (*Id*.) He thought his long-term memory was mostly intact, but he had difficulty with delayed recall. (*Id*.) He also had subjective weakness and was walking slower than before. (*Id*.) He previously felt depressed, but Zoloft helped, and he previously had suicidal ideation but no plan. (*Id*.) His physical examination was mostly normal, except that he could not tandem walk, and mentally he was oriented to person, place, and time. (*Id*. at 530.) He had abnormal recent and remote memory and concentration, difficulty spelling "world" backwards, difficulty with serial 7's (although his difficulty could be related to his education), and

he was able to repeat a sentence back. (*Id.*) He reported difficulty with activities he could do previously and being minimally active at home. (*Id.*) It was noted that he would likely benefit by returning to rehabilitation to improve function. (*Id.*)

On April 7, 2016, Plaintiff was seen at Parkland for an annual examination. (*Id.* at 520.) His physical examination was normal, and his psychological exam showed normal mood, affect, and behavior. (*Id.* at 521.)

On July 28, 2016, Dr. Berchuck completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) for Plaintiff. (*Id.* at 542-47.) He opined that Plaintiff could lift and carry up to 10 pounds occasionally; sit and walk for 15-30 minutes at a time without interruption; stand for 5-30 minutes without interruption; sit, stand, and walk for up to 3 hours in an 8-hour workday; occasionally reach, handle, finger, and feel; occasionally operate foot controls; occasionally climb stairs and ramps; never climb ladders or scaffolds; occasionally balance and stoop; and never kneel, crouch, or crawl. (*Id.* at 542-45.) He found that Plaintiff could not ambulate without a cane, and he could not use his free hand to carry small objects when using a cane. (*Id.* at 543.) Plaintiff was able to hear, understand, and communicate simple instructions and information, but unable to read small print, an ordinary newspaper, or a book. (*Id.* at 545.) He could tolerate moderate noise; never tolerate exposure to unprotected heights, moving mechanical parts, or vibrations; and occasionally tolerate exposure to operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat. (*Id.* at 546.) Due to his cervical fracture, Plaintiff was unable to sit, stand, and walk for long periods of time, had an unsteady gait, and had to ambulate with a cane. (*Id.* at 547.) Dr. Berchuck found that the cervical fracture caused short-term memory loss, continuous migraine headaches, and neck, shoulder, and arm pain. (*Id.*)

### 3. Hearing Testimony

On July 20, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 42-71.) Plaintiff was represented by an attorney. (*Id*. at 42, 44.)

#### a. Plaintiff's Testimony

Plaintiff testified that he was born on July 7, 1965, was right handed, and lived in a house with his spouse and one of his children. (*Id*. at 48-49.) He used his cane with his left hand. (*Id*. at 49.) He had a driver's license and drove on occasion, but his wife drove him to the hearing. (*Id*. at 49-50.) He had completed up to the 12th grade in high school and worked as a "porter" from 1991 until February 2015, which required him to keep bedrooms clean, perform maintenance, move furniture, sweep, mop, and throw away trash. (*Id*. at 50-51.) He did not think he could work anymore because his pain prevented him from doing what he used to do. (*Id*. at 51.) He had headaches as well as pain in his shoulders, neck, and knees that lasted about 8-10 hours a day. (*Id*. at 51-52.) On a typical day, he rated his pain at a 9 out of 10, even with pain medication. (*Id*. at 53.) Certain movements made the pain worse, and pain medication helped relieve the pain. (*Id*. at 52.) He took Aleve, but would take Acetaminophen with codeine #3 when he had it. (*Id*. at 52-53.) He also took medication for his blood pressure and diabetes, and his medications made him sleepy. (*Id*. at 54.) He used a cane to walk and had it with him at the hearing. (*Id*. at 55.)

Plaintiff had not had any surgery other than the one in February 2015, and he previously had physical therapy. (*Id*. at 54.) He also attended PATE Rehabilitation but was unable to go as many times a week as he was scheduled to go because he would be in pain when he left, and it took him days to start feeling back to normal again. (*Id*. at 55.) Plaintiff also reported that he had memory problems as well as problems maintaining attention and concentration, such as forgetting what he

was doing. (*Id*. at 55-56.) He also had problems understanding information or instructions and making decisions, but no problems relating to other people. (*Id*. at 56-57.)

On a typical day, Plaintiff would get up around 5:00 a.m. to see his wife off, and then he would possibly get something to eat and take his medication. (*Id*. at 57.) He would then watch television or try to get comfortable and go back to sleep. (*Id*.) He might also sweep or mop a little, and he could go get something to eat, but he did not grocery shop. (*Id*.) He did not do any outside activities during the course of a week. (*Id*. at 58.)

Plaintiff had been using a walking device since he got out of the hospital to help him feel a little secure because he had problems with his balance, and he had fallen at home previously. (*Id*.) He used a cane all the time, and he estimated that he could walk about 5-10 minutes while using it. (*Id*. at 59.) He thought he could carry a loaf of bread or some lunch meat while walking with his cane. (*Id*.) He would forget to shower for days at a time, and his wife would have to remind him. (*Id*. at 60.) His wife also called him 2-3 times per day to check up on him. (*Id*.) Sitting with his back against a chair caused pain in his neck and head or made it worse, and he had problems turning his head from side to side or looking down due to stiffness and pain. (*Id*. at 60-61.) He also had numbness in his hands and legs at times and sleeping problems due to pain. (*Id*. at 61-62.) His pain made it hard for him to get comfortable, and he sometimes slept in a recliner. (*Id*. at 62.) He used to enjoy playing pool but could not play anymore because of problems balancing. (*Id*. at 62-63.) He also used to like to maintain the cars, cut the grass, and do things around the house, but he could not do those things anymore. (*Id*. at 63.)

### b.     *VE's testimony*

The ALJ asked the VE to characterize Plaintiff's past work history for the previous 15 years.

(*Id*. at 64.) The VE testified that Plaintiff previously worked as a cleaner, commercial or institutional, DOT 381.687-014 (heavy, SVP 2). (*Id*.)

The ALJ then asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff and who was limited to medium exertional work and could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (*Id*. at 64-65.) The VE testified that the hypothetical individual could not perform Plaintiff's past work, but that he could perform other work as an automobile detailer, DOT 915.687-034 (medium, SVP 2), with 30,000 jobs in Texas and 311,000 jobs nationally; a hand packager, DOT 920.587-018 (medium, SVP 2), with 30,000 jobs in Texas and 670,000 jobs nationally; and a warehouse worker, DOT 922.687-058 (medium, SVP 2), with 190,000 jobs in Texas and 2,200,000 jobs nationally. (*Id*. at 65.) This was consistent with the DOT. (*Id*.)

The ALJ next asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff, but who was limited to light exertional work, and could frequently rotate, flex, or extend the neck; understand, remember, and carry out only simple instructions; make simple decisions; attend and concentrate for extended periods; interact frequently with co-workers and supervisors; and respond to changes in a routine work setting. (*Id*. at 65-66.) The VE opined that the individual could not perform Plaintiff's past work, but he could perform other work as a small products assembler, DOT 706.684-022 (light, SVP 2), with 7,500 jobs in Texas and 125,200 jobs nationally; a mailroom clerk, DOT 209.687-026 (light, SVP 2), with 8,000 jobs in Texas and 99,000 jobs nationally; and a room service clerk, DOT 324.577-010 (light, SVP 2), with 14,000 jobs in Texas and 200,000 jobs nationally. (*Id*. at 66.) The VE stated that this was

also consistent with the DOT. (*Id.*)

The ALJ then asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff, and who had the same restrictions as the second hypothetical individual, but this individual would be limited to sedentary work. (*Id.* at 66-67.) The VE testified that the individual could not perform Plaintiff's past work. (*Id.* at 67.) The individual could perform other work as a patcher, DOT 723.687-010 (sedentary, SVP 2), with 1,700 jobs in Texas and 101,000 jobs nationally; a table worker, DOT 739.687-182 (sedentary, SVP 2), with 13,000 jobs in Texas and 250,000 jobs nationally; and a food and beverage order clerk, DOT 209.567-014 (sedentary, SVP 2), with 14,000 jobs in Texas and 200,000 jobs nationally. (*Id.*) This was consistent with the DOT. (*Id.*)

The ALJ also asked the VE to consider a hypothetical individual with the same age, education, and work history as Plaintiff, who was limited to sedentary exertional work, could not attend and concentrate for extended periods of time, and would be off task 20 percent of the time. (*Id.* at 67-68.) The VE opined that the individual could not perform Plaintiff's past work or any other work. (*Id.* at 68.) The ALJ stated that this was consistent with the DOT, but noted that although the DOT did not specifically address off-task time or concentration, she was testifying based on her experience. (*Id.*)

When asked if a 50-year-old individual would be disabled if he had no transferable skills, the VE responded that the rules would direct a conclusion of disabled. (*Id.* at 68-69.) Also, there would be no transferable skills because Plaintiff previously performed unskilled work. (*Id.* at 69.)

C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on October 6, 2016. (*Id.* at 28-37.) At step

one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 14, 2015, the alleged onset date. (*Id*. at 30.) At step two, the ALJ found that he had the following severe impairments: severe obstructive sleep apnea, obesity, degenerative disc disease, cervical myelopathy, traumatic brain injury, and depression. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 30-31.)

Next, the ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work, but included the following limitations: he could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for 6 hours in an 8-hour workday with normal breaks; frequently rotate, flex, or extend his neck; understand, remember, and carry out only simple instructions; make simple decisions; attend and concentrate for extended periods; interact frequently with co-workers and supervisors; and respond to changes in a routine work setting. (*Id*. at 32.)

At step four, the ALJ determined that Plaintiff was unable to perform his past work. (*Id*. at 35.) At step five, the ALJ found that transferability of job skills was not an issue because Plaintiff's past work was unskilled, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*. at 36-37.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from February 14, 2015, through October 6, 2016. (*Id*. at 37.)

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and

terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.  Absent controverting first-hand evidence or a showing of good cause, the ALJ must evaluate the factors set forth at Section 404.1527(c) before she declines to grant controlling weight to a treating physician's opinion. Did the ALJ reversibly err when she gave "partial weight" to the treating physician's opinion but essentially rejected the work-related limitations the physician identified without specifically discussing the Section 404.1527(c) factors?

2.  While the authority to issue an RFC finding rests with the ALJ, the RFC must be based on evidence of work-related limitations. In this case, the ALJ rejected the only medical opinion in the record regarding Plaintiff's work related limitations and independently found that Plaintiff could perform a range of simple, light work. Was the ALJ's RFC supported by substantial evidence when no physician reported such limitations?

(doc. 15 at 5.)

## IV. RFC ASSESSMENT[4]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.

(*See* doc. 15 at 5, 15-19.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should

---

[4] Because both of Plaintiff's issues implicate the ALJ's RFC assessment, they will be considered together.

be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to

perform light work with the following limitations: he could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for 6 hours in an 8-hour workday with normal breaks; frequently rotate, flex, or extend his neck; understand, remember, and carry out only simple instructions; make simple decisions; attend and concentrate for extended periods; interact frequently with co-workers and supervisors; and respond to changes in a routine work setting. (doc. 11-1 at 32-35.)

## A.     Treating Source Opinion

Plaintiff argues that the ALJ erred when she rejected Dr. Berchuck's opinion without good cause and without conducting a detailed analysis as required under 20 C.F.R. § 404.1527(c). (doc. 15 at 11-15.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id.* § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the

source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id*. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id*. at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458.

Here, the ALJ discussed the findings in the medical source statement completed by Dr. Berchuck. (doc. 11-1 at 35.) She also discussed the medical evidence regarding Plaintiff's surgery

and his follow-up appointment. (*Id.* at 33.)[5] In giving Dr. Berchuck's opinion "partial weight," the ALJ determined that his opinion was not consistent with the treatment records in the case, and that Plaintiff had not seen Dr. Berchuck in over a year. (*Id.* at 35.) She further noted that "treatment and office visit[] records in both 2015 and 2016 revealed normal physical examinations with no gait disturbances." (*Id.*) The ALJ gave only partial weight to Dr. Berchuck's opinion to the extent it was consistent with the RFC found in the case. (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1527(c)(1), she specifically stated that she considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*See id.* at 32, 34.) Her decision reflects consideration of the factors: she found that Dr. Berchuck's opinion was inconsistent with the treatment records, that he treated Plaintiff only a couple of times, that he had not met with Plaintiff in over a year, that Plaintiff had no documented problems and was healing nicely at his follow-up appointments, and that x-rays showed intact fixation with no evidence of C1-2 subluxation. (*Id.* at 33, 35.) The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by*, 2013 WL 1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6 (citing *Johnson*, 2010 WL 26469, at *4).

Plaintiff also contends that Dr. Berchuck's opinion was consistent with the record as a whole.

---

[5] As noted, it appears that Plaintiff had another follow-up appointment on April 2, 2015, and the ALJ identified the treatment record in her discussion of the medical evidence. (*See* doc. 11-1 at 33, 35, 388.) It does not appear that any examination was conducted at this appointment, however, and the parties seem to agree that Plaintiff likely received no treatment on April 2, 2015. (*See* docs. 15 at 7, 14; 16 at 3 n.2.)

(doc. 15 at 15.)  As noted, however, the ALJ found Dr. Berchuck's opinion to be inconsistent with Plaintiff's treatment records, which showed that he was healing well, and that he had normal physical findings and no gait disturbances.  (doc. 11-1 at 35.)  As noted, the ALJ "is responsible for assessing the medical evidence," and she properly considered the consistency of Dr. Berchuck's opinion in the medical source statement with the record as a whole in making her determination. *See Perez*, 777 F.2d at 302; *see also Greenspan*, 38 F.3d at 236 (noting that a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

The ALJ's reasons for assigning only partial weight to Dr. Berchuck's medical source statement, combined with her review and analysis of the objective record, satisfy her duty under the regulations and constitute "good cause" for affording only partial weight to Dr. Berchuck's opinion in the medical source statement.  *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527 (c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion).  Remand is therefore not required on this issue.

## B.    <u>Lay Opinion</u>

Plaintiff also argues that the ALJ's decision is contrary to *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), "because she independently concluded that [Plaintiff] could perform simple, light work when no acceptable medical source confirmed this set of limitations."  (doc. 15 at 16-19.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *Ripley*, 67 F.3d at 557. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing," the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work. *Id.* The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557–58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27.

Here, the ALJ considered Dr. Berchuck's medical source statement of Plaintiff's physical ability to perform work related activities. (doc. 11-1 at 35.) Dr. Berchuck opined that Plaintiff could occasionally lift and carry up to 10 pounds; sit and walk for 15-30 minutes at a time without interruption; stand for 5-30 minutes without interruption; sit, stand, and walk for up to 3 hours in an 8-hour workday; occasionally reach, handle, finger, and feel; occasionally operate foot controls; occasionally climb stairs and ramps; never climb ladders or scaffolds; occasionally balance and stoop; never kneel, crouch, or crawl; never ambulate without a cane; never use his free hand to carry

small objects when using a cane; never tolerate exposure to unprotected heights, moving mechanical parts, or vibrations; occasionally tolerate exposure to operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat; tolerate moderate noise; hear, understand, and communicate simple instructions and information; and never read small print, an ordinary newspaper, or a book. (*Id*. at 542-46.) The ALJ expressly gave "partial weight" to this opinion, finding that it was "not consistent with the treatment records," that Dr. Berchuck had not seen Plaintiff in over a year, and that office visit records in 2015 and 2016 "revealed normal physical examinations with no gait disturbances." (*Id*. at 35.)[6] The only portion of the ALJ's RFC assessment that is consistent with Dr. Berchuck's opinion is her finding that Plaintiff could "understand, remember, and carry out only simple instructions . . . ." (*Id*. at 32, 35.)

While the ALJ may choose to reject Dr. Berchuck's opinion, "[s]he cannot independently decide the effects of Plaintiff's . . . impairments on [his] ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013). There are no other medical opinions in the record regarding the effects Plaintiff's impairments had on his ability to work; rather, the ALJ appears to have relied upon the medical evidence, including treatment notes from Parkland, in determining Plaintiff's RFC. (doc. 11-1 at 32-35.) None of that evidence addressed the effects of Plaintiff's impairments on his ability to work, however. *See Browning*, 2003 WL 1831112, at *7 (finding despite the fact that there was a vast amount of treating sources' medical evidence in the record establishing that plaintiff suffered

---

[6] The ALJ also considered opinions from two state agency medical consultants (SAMCs), but the SAMCs did not conduct RFC evaluations because they found that Plaintiff's impairments would be non-severe 12 months after the onset date. (*Id*. at 34-35.) The ALJ expressly gave the opinions of the SAMCs "little weight", however, because they were inconsistent with the evidence of record and the SAMCs "did not have the benefit of reviewing all of the evidence received at the hearing level prior to making their assessments." (*Id*.)

from certain impairments, including voluminous progress reports, clinical notes, and lab reports, "none [made] any explicit or implied reference to effects these conditions [had] on claimant's ability to work" and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC.

The ALJ therefore appears to have relied on her own opinion, which she may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("[a]n ALJ may not–without the opinions from medical experts–derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination). Consequently, substantial evidence does not support the ALJ's RFC determination. *See Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff

must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects his impairments had on his ability to work casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Here, as in *Williams*, the ALJ's failure to rely on medical opinion evidence in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the ALJ's finding that Plaintiff is not disabled, and remand is therefore required on this issue. *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions in determining the RFC); *see also Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failed to rely on a medial opinion in determining the plaintiff's RFC).

## V.   CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further administrative proceedings.

**SO ORDERED**, on this 6th day of March, 2019.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE